# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                                    Case No. 05-CR-227

JOSEPH LALOTA, JR.,

        Defendant.

## DECISION AND ORDER ON PLAINTIFF'S MOTION TO DISQUALIFY ATTORNEYS ROSEN AND FROCCARO

### I. PROCEDURAL BACKGROUND

This criminal proceeding commenced on August 11, 2005, when a complaint was filed in the United States District Court for the Eastern District of Wisconsin naming six individuals as defendants. One of those named as a defendant was Joseph Lalota, Jr. ("Mr. Lalota" or "Lalota"). All six individuals were charged with having participated in a mail fraud scheme in violation of Title 18 U.S.C. §§ 1341 and 2. On August 31, 2005, Attorney Michael Rosen ("Attorney Rosen" or "Mr. Rosen" or "Rosen") filed a letter with the clerk of court asking that the clerk enter his appearance on behalf of Lalota. Thereafter, on September 13, 2005, a grand jury sitting in the Eastern District of Wisconsin returned an indictment naming as defendants the same six individuals who were named as defendants in the complaint. On September 14, 2005, two of the defendants, LaLota and Charles Yellen ("Mr. Yellen" or "Yellen"), were arraigned. At that time, Attorney Rosen was not present. Instead, Attorney Marion Bachrach ("Attorney Bachrach" or "Bachrach"), who entered an appearance as counsel for Yellen, indicated that she was appearing on behalf of Lalota as well, but

only for purposes of the arraignment. Both defendants entered not guilty pleas and a pretrial order setting forth the dates by which pretrial motions were to be filed was issued.

Thereafter, on March 2, 2006, the grand jury returned a superseding indictment. Only three of the original six defendants were named in the superseding indictment, those being Lalota, Simuel Burrell and Joseph Scorsone. One of the original six, Jill McBrayer, had died since the return of the original indictment. Furthermore, prior to the return of the superseding indictment, Yellen had undertaken plea discussions with the government. On March 10, 2006, Lalota was arraigned on the superseding indictment. Shortly thereafter, the Honorable J.P. Stadtmueller, the district judge to whom the case had been assigned, adjourned the trial date from March 27, 2006, to July 24, 2006.

The trial did not proceed as scheduled. This is because on July 12, 2006, the government filed a "Motion for Hearing" for the purpose of "resolv[ing] an issue regarding a potential conflict of interest." (Gov't's Mot. at 1.) Simply stated, at issue was whether Attorney Rosen, who was then serving as Lalota's counsel, previously represented Yellen, who was now going to be a government witness in its case against Lalota. According to the affidavit of Assistant United States Attorney Gail Hoffman,

> 6. Since Mr. Yellen claimed that Attorney Rosen represented him initially during the pendency of his case, and recently through his wife, it appears that facts exist to suggest that during the course of this case Mr. Rosen represented both Mr. Yellen, a witness in this case, and Mr. Lalota, a defendant. The government therefore believes that a record is necessary in order to establish facts. Without resolution, a potentially reversible situation exists upon conviction of Mr. Lalota.
>
> 7. The matters [that the] government seeks to determine [are] whether a conflict exists and to what extent, if any, Mr. Rosen's cross-examination of Mr. Yellen is prohibited by any information he gleaned that is privileged.
>
> 8. I have talked to Mr. Rosen and he categorically denied that at any point he represented Mr. Yellen.

2

(Hoffman Aff, ¶¶ 6-8.)  On Monday July 17, 2006, a hearing was conducted to develop a factual record regarding the concerns expressed in the government's motion for hearing.  Testifying at that hearing were Charles Yellen, Jodi Krieger-Yellen (Yellen's spouse; "Ms. Yellen"), Attorney Rosen and Attorney James Froccaro ("Attorney Frocarro" or "Mr. Frocarro" or "Frocarro").  At the conclusion of the hearing, AUSA Hoffman indicated that she wished to have until the next day to consider more fully the testimony presented at the hearing and to consult with others at the U.S. Attorney's Office before deciding whether to proceed with a motion to disqualify either Attorney Rosen or Attorney Froccaro, or both, from representing Lalota.  The next day, July 18, 2006, AUSA Hoffman advised the court and the parties that the government (with Mr. Yellen  joining therein) would be seeking the disqualification of both Attorneys Rosen and Froccaro from further representing Joseph Lalota in this criminal proceeding.

A briefing schedule was established.  The parties (including Mr. Yellen's counsel, Attorney Bachrach) filed briefs (together with affidavits and other documents) in support of their respective positions on the government's motion.  Thus, the government's motion is now fully briefed and is ready for resolution.  For the reasons which follow, the government's motion will be granted.

## II.  FACTUAL BACKGROUND

As previously stated, an evidentiary hearing was conducted on July 17, 2006.  Four witnesses testified: Mr. Yellen, Ms. Yellen, Mr. Rosen, and Mr. Frocarro.  The focus of the testimony centered principally on whether Rosen served as Yellen's attorney during the course of a prior New York state criminal prosecution (the "Zum Zum" case) and whether Rosen served as Yellen's attorney during the preliminary stages of the instant federal prosecution.  Yellen and his spouse, Ms. Yellen, maintain that he did.  Rosen maintains that he never represented Yellen in either the Zum Zum case or in the

3

instant case. Rather, according to Rosen, in both the Zum Zum case and in the instant federal case, he represented only Lalota. Again, according to Rosen (and according to Frocarro), Frocarro represented Yellen in the Zum Zum case. Frocarro never represented Yellen in the instant federal case.

## A. Yellen's Testimony

Yellen testified that in May of 2004 he and his business partner, Lalota, were charged by the State of New York with criminal violations stemming from their receiving payoffs for work that their collection agency ("Principal Credit Corporation" or "PCC") did not actually perform. More precisely, they were being paid by the credit manager of Zum Zum Company for collection work that was not actually performed by PCC. According to Yellen, Attorneys Rosen and Frocarro were paid by PCC to represent the two of them. Throughout the pendency of the Zum Zum case, Lalota and Yellen always met together with Attorneys Rosen and Frocarro. Indeed, Yellen testified that he never met alone with Frocarro, even though it was Frocarro who formally represented Yellen in court. Furthermore, Yellen testified that he provided information to Attorney Rosen which he, Yellen, considered to be confidential.

On or about December 21, 2004, Lalota called Yellen and told him that he had been contacted by the FBI concerning the "matter of Al[len] Edmonds." (Tr. at 15.) Upon being told this, Yellen asked Lalota whether he had contacted Attorney Rosen. Although Yellen did not recall how Lalota responded to this question, Yellen recalled that on or about December 22, 2004, Lalota and he had a telephone conference call with Rosen. According to Yellen, during this telephone conversation both he and Lalota "ma[d]e statements to Mr. Rosen regarding [the Allen-Edmonds] matter." (Tr. at 17.) According to Yellen, Rosen wanted to arrange a meeting. Before that meeting had occurred,

4

however, Yellen was contacted by the FBI. This would have been on December 22, 2004. Because Yellen had been instructed by Rosen to do so during the conference call, Yellen called back the FBI agent and did not say anything other than to give the agent Mr. Rosen's telephone number. At that point, Yellen considered Attorney Rosen to be his lawyer, even though Yellen had not retained Rosen, nor had they even talked about a fee. (Tr. at 30.)

Yellen testified that a day or two after he returned the FBI agent's call, Lalota and he met with Rosen. This would have been on either December 23 or 24, 2004. During the course of that meeting with Rosen, both Lalota and Yellen made "incriminating statements regarding [themselves]." (Tr. at 20.) They also discussed options for possible defenses. Furthermore, at some point during the course of that meeting, Attorney Frocarro arrived and joined in the meeting. Once Attorney Froccaro arrived, Attorney Rosen brought him up to speed. Although Yellen did not ask Frocarro to attend the meeting, he "assumed he would be there." (Tr. at 21.)

On cross-examination Yellen acknowledged that, during the course of the Zum Zum case, Attorney Rosen told Yellen that he, Rosen, could not represent two defendants in the same case and that Yellen would need to have his own lawyer. Thus, PCC retained Frocarro for Yellen and Frocarro "spoke on [Yellen's] behalf." (Tr. at 25.)

On the same night that Lalota had told Yellen about his call from the FBI, Yellen told his wife, Ms. Yellen, about the FBI contact. Thereafter, she told Yellen that she wanted to speak with Mr. Rosen. This was because "[s]he wanted to have an understanding of what this was about and what would be ahead of us." (Tr. at 20-21.) As a result, Yellen called Attorney Rosen and asked him to talk to Yellen's wife about "some possible new problem." (Tr. at 32.) Rosen told Yellen that he was preparing for a trial but that Yellen should have his wife call him and he would set up a meeting

Case 2:05-cr-00227-CNC   Filed 09/12/06   Page 5 of 29   Document 131

at an office in uptown New York where Rosen was working on the trial preparation. According to Yellen, Rosen said that he would speak to his wife and "explain to her what was going on." (Tr. at 32.)

Yellen also testified on cross-examination that at some point in time, he wasn't sure when, he called Frocarro to thank him for his help in the Zum Zum matter, and told Frocarro that he was going "get other counsel [and] would not be using [Frocarro]" in the Allen-Edmonds case. (Tr. at 34-35.)

## B. Ms. Yellen's Testimony

Jodi Krieger-Yellen testified that she is Yellen's wife. Ms. Yellen is also a lawyer, specializing in "trusts and estates, estate planning, administration, representation of charitable organizations and counseling families in their personal nature." (Tr. at 41.)

Ms. Yellen testified that during the course of the Zum Zum case, Mr. Rosen had called their home and asked to speak with her husband. She also testified that she understood Mr. Frocarro to be somebody who worked with Mr. Rosen. (Tr. at 42-43.)

On December 21, 2004, Ms. Yellen was told by her husband that the FBI had contacted him regarding another criminal matter (the Allen-Edmonds investigation). At that point Ms. Yellen told her husband to "'[c]all the FBI back and advise them that you are represented by an attorney and give them Mike [Rosen's] name and phone number.'" (Tr. at 44.)

Subsequently, Ms. Yellen called Attorney Rosen on his cell phone. Mr. Yellen had given her the number and said "'Call him and he'll be happy to meet with you.'" (Tr. at 44.) Arrangements were made to meet Mr. Rosen at an office on 57th Street, off 3rd Avenue in New York City. This meeting occurred sometime between Christmas and New Year's in 2004. (Tr. at 53.) Upon her

6

arrival at the office, she and Rosen went into a conference room. The meeting lasted about an hour-and-a-half. Ms. Yellen testified as follows with respect to the matters discussed between them.

Q. Did he have a concern about talking to you about the facts of the case?

A. Yes. At one point during the meeting that did come up.

Q. What did he say to you in that regard?

A. He said because I was an attorney, he would deem me as his co-counsel so that the attorney/client privilege would be preserved.

Q. Did he talk to you about the facts of the case related to your husband?

A. Yes, he did.

Q. Did he talk to you about things your husband had told to him?

A. Yes, he did.

Q. Did he - - what else did he discuss with you?

A. He discussed - - I asked him questions about what would go on. He discussed the Federal prison system. He discussed the procedure of the case. He discussed that he wanted the matter - - he wanted to work out some type of deal and bring the matter back to New York for sentencing because he knew a number of the Judges in the Eastern and Southern District.

He also, at one point during the conversation, said to me, "If the boys would have only given her cash, we wouldn't be here." She - - he also expressed to me that he was extremely angry that both my husband, Charles, and Joseph LaLota did not go over the facts of this in the first case.

Q. Did he also indicate to you at some point during this meeting that the boys would have to spend time in prison?

A. Yes, he did. He said this would not be like the last case, but he assured me, as a very, very nervous spouse, that the Federal prison system was different than the State prison system. He was very clear about that.

Q. During the course of this meeting, did Jimmy Frocarro's name ever come up?

7

A. No.

Q. Did you - - ultimately when you left, were there any questions that he hadn't answered for you, that Mr. Rosen hadn't answered?

A. No.

(Tr. at 46-48.) Mr. Rosen also told her that he had not spoken to anybody in Wisconsin about the case. (Tr. at 56- 57.)

## C. Attorney Rosen's Testimony

Mr. Rosen testified that he is an attorney who has been admitted to the bar of the State of New York since 1964. Mr. Rosen testified that during the Zum Zum case he represented Lalota and Attorney Frocarro represented Yellen. According to Mr. Rosen, "[he] did not and do[es] not have any knowledge of anything inappropriate that Charles Yellen did or said to [him] from the beginning of Zum Zum [until when] Ms. Bachrach took over [in February of 2005]." (Tr. at 74.)

Mr. Rosen did not recall Lalota or Yellen calling him on either December 21 or 22, 2004, after the FBI contacted Lalota. However, he did recall getting a telephone call from an FBI agent. Mr. Rosen then called the FBI and spoke with FBI Agent Strong. Rosen asked to speak with the AUSA who was handling the case. Rosen was told that AUSA Erica O'Neil was assigned the case, but that she was unavailable. Rosen was unable to reach anybody in the U.S. Attorney's Office concerning the case prior to his meeting with Ms. Yellen. Rosen further testified that he did not have any recollection of meeting with Lalota and Yellen prior to getting the telephone call from Yellen asking Rosen to meet with Ms. Yellen. (Tr. at 68; 91.) Nor did he recall having a three-way telephone conversation with Lalota and Yellen prior to his meeting with Ms. Yellen. (Tr. at 94-95.) According to Rosen, Yellen called him and said "'Hey, Mike, my wife is like very anxious and stuff.

Would you do me a favor and see her?' and I said, 'Charlie, I'm like crazed. I'm preparing for this trial in the Eastern District, but, okay, I'll do you a favor.'" (Tr. at 68.) Rosen recalled that the meeting with Ms. Yellen occurred sometime between Christmas and New Year's, "but it was closer to New Year's." (Tr. at 69.) According to Mr. Rosen,

So what happened was Mrs. Yellen came up. I met her for the first time. We went into the Newman & Greenberg conference room, and I said to her, "I know you're an attorney, but I represent Joe LaLota." . . . I can't say anything to you, but you are an attorney. You can stand in for Charles Yellen, and now we have no questions of privilege. There's lawyers on both sides."

"I don't know anything. I tried to reach Assistants. I didn't reach anybody. I don't know anything."

But I was then asked, "Well, I mean, what lies ahead for them?" or something like that. I mean, "What's going to happen?" I said, "Look, the Federal system is totally different." And this is the FBI, so it's the Federal system. "It's totally different than the State system."

. . . .

I did not and would not have said to her, "These boys would have been okay if they would have given her cash." I knew nothing . . . I didn't know about the case.

. . . .

But I told Mrs. Yellen, "I can't represent your husband" just like I couldn't represent her husband in the prior case. And she knew I wasn't his lawyer in that prior case. Mr. Yellen knew I wasn't his lawyer, as they were partners. . . and we met together in Jim Frocarro's office in Port Washington, New York, which is near my home, and it's near his home. And that's where I work out of some times. There's no question about it.

We met with Mr. LaLota, Mr. Yellen, on the Zum Zum case. . . .

And that's where we met. We never met on the Alan Edmonds case. . . .

So I could not have imparted and did not impart anything to Mrs. Yellen about this case. Her husband never said anything incriminatory to me, never - - did not admit any kind of misconduct. I know of no misconduct of Mr. Yellen's other than

9

what he's pled to in an open court and what he's said to the Government in their 302's now, which have been turned over.

He has not revealed any secrets to me, any private conversations to me. And even if had he, I would promise, of course, not to use it in defending Mr. Lalota. But he didn't. He didn't say anything negative about himself to me.

I mean, I know about Zum Zum because they pled - - he pled in an open courtroom. But as far as Alan Edmonds, there's nothing I learned from him that would incringe (sic) or impinge on the attorney/client privilege.

. . . .

But I did not and do not have any knowledge of anything inappropriate that Charles Yellen did or said to me from the beginning of Zum Zum till Ms. Bachrach took over, I think she said in February of '05 . . .

(Tr. at 69-74.) Mr. Rosen further testified that, although he may have called Yellen to set up meetings among Lalota, Frocarro, Yellen and him in connection with the Zum Zum case, Rosen at no time represented Yellen in the Zum Zum case. Indeed, it was Frocarro who worked out the plea arrangement for both Lalota and Yellen with the New York State authorities in the Zum Zum case.

Mr. Rosen testified that he served as PCC's custodian of records in appearing before the New York State grand jury and produced records on behalf of PCC in compliance with a grand jury subpoena. (Tr. at 82.) He also testified that in the Zum Zum matter his retainer to represent Lalota was paid by PCC, and that Frocarro's retainer to represent Yellen was also paid by PCC.

Mr. Rosen further testified that, although he may have accompanied both Lalota and Yellen at the time they were initially processed, arraigned, and released on bond in the Zum Zum case, it was only as a courtesy to Frocarro who was unable to accompany Mr. Yellen that day. Indeed, it was not unlike Ms. Bachrach's accompanying Lalota and Yellen at their arraignments in the instant federal case, when Mr. Rosen was unable to attend with Mr. Lalota.

10

**D. Attorney Frocarro's Testimony**

Mr. Frocarro testified that he is an attorney who has practiced for almost 20 years. He is a member of the New York State Bar as well as the bars of the Eastern and Southern Districts of New York. Frocarro was contacted by Rosen and was told by Rosen that he had a longstanding client, Lalota, who was being investigated by the New York County District Attorney's Office. Lalota had a partner in his business, Mr. Yellen, who was also being investigated. Yellen needed a lawyer because Rosen could not represent both of them. As a result, Frocarro met with Yellen. Yellen "said he liked [Frocarro] and he wanted [Frocarro] to represent him." (Tr. at 119.) Mr. Frocarro testified that "Mr. Rosen made the introduction. Mr. Yellen was free to use me or not use me. He decided he wanted me to represent him." (Tr. at 127.) Frocarro discussed his fee with Yellen. Frocarro did not discuss his fee with Mr. Rosen and Mr. Rosen did not set Frocarro's fee for representing Yellen. (Tr. a t 127.)

Mr. Frocarro continued to represent Yellen throughout the negotiations with the New York prosecutors. Frocarro and Rosen both met with the state prosecutor "as a defense team, to talk about Mr. Lalota and Mr. Yellen, and we talked about disposing of the case." (Tr. at 120.) After these discussions, Frocarro would contact Yellen on the telephone. Ultimately, the state case was resolved by plea. Frocarro appeared with Yellen at his plea hearing in state court.

Some time thereafter, Frocarro was contacted by Yellen. Yellen told Frocarro that he was being investigated by the FBI in connection with Allen-Edmonds. This would have been somewhere around the very end of 2004 and the beginning of the year 2005. (Tr. at 122; 138.) Frocarro testified that he had no specific recollection of a meeting at which Rosen, Frocarro, Lalota, and Yellen were present at that time. (Tr. at 121-122.) In any event, according to Frocarro,

11

[t]he last discussion I had with [Yellen] was he called me to tell me, "Jimmy, you know, I want to thank you. You did a fabulous job for me in connection with the State case. My wife is adamant that I use another lawyer. She wants me to use a woman by the name Marian Bachrach." He says, "I just want to let you know you're not going to be representing me anymore." I said, 'Charlie, good luck," you know, "I wish you the best, and goodbye."

(Tr. at 123.)

According to Frocarro, in the Zum Zum case, Frocarro "was absolutely [Yellen's] lawyer." (Tr. at 124.) During the course of his representation, he met with Yellen, along with Rosen and Lalota. (Tr. at 119.) Frocarro did meet with Yellen "once alone, and that was prior to his arraignment because he was very nervous about having to be arraigned. He was afraid he was going to have to stay in jail, and he met with me alone one night at my office. And I assured him that [Mr. Rosen] would cover it as a courtesy to me and that we had already prearranged that there was going to be no bail, so he should be out right away. And that's the only time that I believe I met with him alone." (Tr. at 119-20.)

After the Allen-Edmonds investigation came to light and Yellen told Frocarro that he would not be representing him, Yellen nevertheless told Frocarro that he had no problem with Frocarro staying on as corporate counsel to PCC. (Tr. at 129.)

When the FBI contacted Yellen, he did not call Frocarro. Nor did he give Frocarro's name to the FBI as his counsel. (Tr. at 129.)

Frocarro testified that during the course of the Zum Zum case Yellen "absolutely"confided in him. Frocarro also testified that he would take those confidences with him "to the grave. I would never tell anybody them." (Tr. at 134.) Furthermore, although in the Zum Zum case Frocarro and

12

Rosen exchanged information about that case, no confidential information was exchanged. (Tr. at 135.)

Frocarro testified that, to the extent that Yellen testified that he never met alone with Frocarro, Yellen was lying. (Tr. at 139-140.)

## E. Yellen's Rebuttal Testimony

After Frocarro testified, Yellen was recalled to the witness stand. Yellen testified that the first time he contacted Frocarro after he, Yellen, was contacted by the FBI in the Allen-Edmonds matter was in January of 2005. As for the purpose of contacting him Yellen testified that, "[a]s he was aware, we had the civil matter, and I needed the release. And I did thank him for his help [on the Zum Zum case]." (Tr. at 144.) [1]

Yellen again testified that, during the Zum Zum case, Frocarro "never met with [him] privately ever." (Tr. at 144.)

## F. The Post-Hearing Affidavits and Exhibits

Apparently not entirely satisfied with the factual presentation made at the hearing, on July 31, 2006 and on August 22, 2006, Yellen filed affidavits in further support of the government's motion for disqualification. Much of what Yellen presents in his affidavits is in the nature of argument. However, in his affidavit that was executed on August 17, 2006 and filed on August 22, 2006, Yellen avers:

> 6. The reason I considered Mr. Rosen to be my attorney was not because he had sheperded both LaLota and me through surrender and arraignment. The reason I considered Mr. Rosen my attorney – and said so to the FBI agent – was because he was the lawyer I (and LaLota) spoke to at every juncture in the case, sometimes alone

---

[1] Attorney Frocarro had previously testified on cross-examination that in January of 2005 Yellen "absolutely did not" call him to ask him for a release. (Tr. at 131.)

and sometimes with Mr. Frocarro in attendance. He was the lawyer to whom I/we gave records (and he then presented them to the grand jury); he was the lawyer with whom I/we discussed the investigation; he was the lawyer with whom I/we discussed strategy; and he was the lawyer with whom I/we discussed the guilty plea and the negotiations with the Assistant District Attorney. Mr. Rosen was also the lawyer with whom I/we spoke about [the Allen-Edmonds] case after LaLota spoke to the FBI agent and before I returned the telephone call from the same agent.

(Yellen Aff. ¶ 6.)

Furthermore, Attorney Rosen filed a motion to file a sur-reply memorandum in opposition to the plaintiff's motion. Accompanying that sur-reply were a number of exhibits. According to Attorney Rosen, these exhibits cast doubt on Yellen's credibility. More precisely, Yellen acknowledged that he contacted Frocarro in early 2005; such contact was for the purpose of obtaining a release in "the civil matter." (Tr. at 144.) However, according to Attorney Rosen,

The statements made under oath by both Yellens at the hearing – and by Yellen again now in his August 17 affidavit are false. As set forth below, there was no reason for Yellen to have asked for a copy of the release from Attorney Frocarro in "January" of 2005, so he "could give it to another lawyer."

For this Court's information, during the pendency of the Zum Zum criminal case, Yellen was also sued by Zum Zum. He was also represented in this companion civil matter from start to finish by Attorney Frocarro. The Zum Zum civil matter was settled contemporaneously with the conclusion of the Zum Zum criminal case in New York and a release was issued by Zum Zum to Yellen.

Yellen was subsequently sued again, however, this time by JP Morgan Chase Bank in a third-party action also related to the Zum Zum criminal case. This is the pending civil action both Yellens claim to have been "concerned' about in January of 2005. What both Yellens apparently forgot before concocting their stories here was that the Summons in the action instituted by JP Morgan Chase Bank against Yellen was not even drafted until March of 2005. And, Yellen was not served with notice of this action until a month later in April of 2005 – more than four months after the January phone call to Attorney Frocarro. Attached hereto as Exhibit 1, is a copy of the JP Morgan Chase Third-Party Summons, dated March 7, 2005.

The Yellens also apparently forgot that Yellen asked Attorney Frocarro to represent him in the JP Morgan Chase civil case. Why would Yellen have needed the

14

release from Attorney Frocarro to "give to another lawyer" – when Attorney Frocarro was representing him in this matter. Indeed, Attorney Frocarro interposed an answer on behalf of Yellen in [the JP Morgan civil] action in June of 2005, which raised as an affirmative defense, and included as an exhibit, the aforementioned release. A copy of the Answer is attached hereto as Exhibit 2.

Attorney Frocarro remained Yellen's lawyer in the JP Morgan Chase/Zum Zum related civil matter until December of 2005, when Yellen retained new counsel. A copy of the fully executed Substitution of Attorney form, dated December 9, 2005, is also attached hereto for the Court's review as Exhibit 3.

The aforesaid documentary proof is indisputable – and clearly places the Yellens' credibility in issue. It clearly demonstrates that the Yellens are not being candid with this Court about the 11th hour conflict issue raised here.

(Sur-reply at 11-13.)

## III. DISCUSSION

On June 26, 2006, the United States Supreme Court issued its decision in *United States v. Gonzalez-Lopez*, 126 S.Ct. 2557 (2006), in which decision it made clear that the right to counsel of one's choice in a criminal case is firmly rooted in the U.S. Constitution.

The right to select counsel of one's choice . . . has never been derived from the Sixth Amendment's purpose of ensuring a fair trial. It has been regarded as the root meaning of the constitutional guarantee. Where the right to be assisted by counsel of one's choice is wrongly denied, therefore, it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation. Deprivation of the right is "complete" when the defendant is erroneously prevented from being represented by the lawyer he wants, regardless of the quality of the representation he received. To argue otherwise is to confuse the right to counsel of choice-which is the right to a particular lawyer regardless of comparative effectiveness-with the right to effective counsel-which imposes a baseline requirement of competence on whatever lawyer is chosen or appointed.

*Gonzalez-Lopez*, 126 S.Ct at 2563 (citations omitted). Thus, before granting a motion to disqualify such as that which is presented here, a court must be convinced that it is on sound footing. This is not to say that a motion to disqualify should never be granted, or that it should only be granted in the

15

most egregious set of circumstances.  It is to say, however, that a court should not lightly grant such motions, as to do so could deny a criminal defendant the now-firmly entrenched right to counsel of one's choice.  More to the point, to "wrongly" or "erroneously" deny such defendant the counsel of his choice would render any resulting conviction subject to reversal, regardless of how ably that defendant may have been represented at trial by counsel who was not his choice (or was not his first choice).

As is evident from the foregoing, it is only by wrongfully or erroneously denying a criminal defendant the counsel of his choice that the Sixth Amendment is violated.  Thus, if there are certain facts or circumstances presented which would render such a denial neither wrongful nor erroneous, then it logically follows that such denial would not be a violation of the Sixth Amendment.  And so the question to be answered is: Under what circumstances may a trial court deny a criminal defendant the counsel of his choice and have such denial be neither wrongful nor erroneous?

One set of circumstances under which such a denial would be neither wrongful nor erroneous was addressed by the Supreme Court in *Wheat v. United States*, 486 U.S. 153 (1988).  That set of circumstances occurs when a defendant's counsel of choice has, or there is serious risk of his having, a conflict of interest by virtue of the fact that he also represents (or previously represented) one of the witnesses who is going to testify against the defendant.  Under such circumstances, an attorney, "because of his prior representation of [the witness], would [be] unable ethically to provide [vigorous] cross-examination." *Wheat,* 486 U.S. at 164.  The Court went on to conclude that "[t]he District Court must recognize a presumption in favor of [a defendant's] counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict.  The evaluation of the facts and circumstances of each case under this

16

standard must be left primarily to the informed judgment of the trial court." *Id.* In the process of reaching this conclusion the Court observed that "the district court must be allowed substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Id.* at 163.

Of course, in *Wheat* the defendant and the witness had been allegedly involved in the same drug conspiracy. Thus, cross-examination would have been centered on that conspiracy. Furthermore, there was no question about whether the defendant's lawyer of choice had previously represented the witness; he had represented him. The case at bar presents a different set of circumstances, at least with respect to Mr. Rosen.

In the instant case, the parties dispute whether Mr. Rosen served as Yellen's counsel in the Zum Zum criminal proceedings. Yellen claims that he did; Rosen claims that he did not. Furthermore, Yellen claims that he revealed to Rosen confidential, incriminatory information in connection with the Zum Zum case; Rosen claims that Yellen did not reveal any such information to him. Moreover, Yellen claims that Frocarro served as his lawyer only as a formality; that it was Rosen who was really the lawyer upon whom both Lalota and he relied. By contrast, Rosen and Frocarro both maintain that Frocarro genuinely served as Yellen's lawyer, albeit at the same time acknowledging that there may have been jointly held meetings, jointly planned strategy sessions, and jointly undertaken plea negotiations with the state authorities.

To be sure, it was Attorney Frocarro who entered an appearance on behalf of Yellen at the plea hearing in the Zum Zum case. The transcript of that proceeding, which was submitted along

17

with Lalota's brief, makes that clear. What is also clear, however, is that Attorney Rosen, Attorney Frocarro, Lalota, and Yellen did meet collectively in conjunction with the Zum Zum case. Indeed, Mr. Rosen testified that Attorney Frocarro and he would meet "out on the Island" with Lalota and Yellen because it was convenient for the four of them to meet out there. (Tr. at 80.) Notably, when asked whether Yellen had discussions with Mr. Rosen about the Zum Zum case, Mr. Rosen responded, "Not alone that I recall." This would suggest that Yellen did have discussions with Mr. Rosen in the company of others, which gives rise to the inference that such discussions took place when Rosen, Frocarro, Lalota, and Yellen met together. When asked whether Yellen had "discussions where he made incriminating comments about himself about the first [Zum Zum] case," Mr. Rosen responded as follows:

> I think when we got to the point where we were authorized to try to negotiate a plea, I said, "You've got to plead guilty in front of a Judge." And I think at one point - - at least I recall - - he had to say he was guilty, but he had his own agenda, and Mr. Lalota had an agenda of his own. But that - - I can't reveal that at this point. . . . He didn't make anything incriminating.

(Tr. at 81-82.)

Mr. Yellen testified that he never met alone with Attorney Frocarro. By contrast, Attorney Frocarro testified that he and Yellen did meet alone and therefore Yellen was lying on this point. Even so, Attorney Frocarro went on to testify that he and Yellen met alone only once; and this one time was for the purpose of giving assurances to Yellen prior to the arraignment on the Zum Zum charges:

> I believe I met with him once alone, and that was prior to his arraignment because he was very nervous about having to be arraigned. He was afraid he was going to have to stay in jail, and he met with me alone one night at my office. And I assured him that [Attorney Rosen] would cover it as a courtesy to me and that we had already

18

prearranged that there was going to be no bail, so he should be out right away. And that's the only time that I believe I met with him alone.

(Tr. at 119-20.) Accepting *arguendo* the testimony of Attorney Frocarro that he met alone with Yellen only once, and that meeting was for the limited purpose set forth above, it logically follows that any incriminating statements that Yellen made (or, at a minimum, adoptive admissions to which he could be bound) about his involvement in the Zum Zum scheme (to which scheme he entered a plea of guilty) must have been made during the meetings at which Attorney Rosen, Attorney Frocarro, and Lalota were present. That is, of course, unless he never made any incriminating statements until such time as he entered his guilty plea. And, I decline to accept that latter proposition. After all, a competent lawyer would never allow his client to plead guilty to a crime that the lawyer was not persuaded his client could be convicted of. In the process of the lawyer's evaluating the advisability of his client's entering a guilty plea, it is highly likely that the lawyer would be privy to, and would take into consideration, the client's side of the story. And, in such situation, the client's side of the story would most likely include incriminating statements.

And so, I conclude it to be likely that Yellen made incriminating statements about his wrongdoing in the Zum Zum matter and that such statements were made in the presence of both Rosen and Frocarro. In light of the foregoing discussion, it could not be otherwise. I further conclude that such statements would be protected from disclosure by the "joint defense" doctrine.

> The "common interest" or "joint defense" doctrine "generally allows a defendant to assert the attorney-client privilege to protect his statements made in confidence not to his own lawyer, but to an attorney for a co-defendant for a common purpose related to the defense of both. The same general rule (sometimes going by the name "common defense rule") protects "communications by a client to his own lawyer . . . when the lawyer subsequently shares them with co-defendants for purposes of a common defense." The joint defense privilege . . . has been described as "an extension of the attorney client privilege[.]" It serves to protect the confidentiality of

communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel.

*United States v. Evans*, 113 F.3d 1457, 1467 (7th Cir. 1997) (citations omitted); *see also United States v. McPartlin*, 595 F.2d 1321, 1337 (7th Cir. 1979) ("The privilege protects pooling of information for any defense purpose common to the participating defendants. Cooperation between defendants in such circumstances is often not only in their own best interests but serves to expedite the trial or . . . the trial preparation.").

Simply stated, although there may not have been a formally signed joint defense agreement, it is clear that Rosen, Frocarro, Lalota, and Yellen were operating under the assumption that there was a joint defense agreement. Indeed, Mr. Rosen himself described the relationship that Mr. Frocarro, Mr. Lalota, Mr. Yellen, and he had during the Zum Zum case as follows:

> A. I can't tell you specifically who met alone. There were four people; we were on a team, remember that? We were on a team . . .
>
> . . . .
>
> Q. My question is, in Zum Zum, are there times that you met with Mr. Yellen and Mr. Lalota when Mr. Frocarro was not present?
>
> A. There may have been times.
>
> Q. And is it your testimony that those are joint defense meetings where the attorney for the other defendant is not present?
>
> A. Absolutely.

(Tr. at 106-07.) Given the foregoing, it is my opinion that the attorney-client privilege (as augmented by the joint defense doctrine) would protect from disclosure by Rosen or Frocarro any information

20

shared by Yellen with the "team" of Rosen, Frocarro, Lalota, and Yellen. Reaching such a conclusion, however, does not end the analysis.

As noted previously, in *Wheat* the former client-turned witness was involved in the same conspiracy as the defendant. 486 U.S. at 155. Thus, cross-examination would likely have included questions about the witness's involvement in that conspiracy, and at least some of those questions could find their genesis in information previously shared with the witness's former counsel, who now represented the defendant. In the alternative, if in *Wheat* the defendant's counsel did not ask certain questions of the witness for fear of violating the confidences of his former client-turned witness, then he would not have been affording the defendant the conflict-free vigorous representation to which the defendant was entitled. Obviously, in the instant case it is not the Zum Zum fraud scheme with which Lalota is charged. Instead, Lalota is charged in an entirely different fraud scheme, involving an entirely separate victim, to wit, the Allen-Edmonds Company.

However, that the crime charged in the instant indictment involves an entirely different scheme than the Zum Zum scheme is not dispositive of the conflict of interest issue in this case. This is because the government has indicated that it intends to introduce evidence about the Zum Zum matter at trial under Fed. R. Evid. 404(b). If the government is successful in persuading the trial court to admit such evidence, Mr. Rosen would be in a position where he would either be constrained when cross-examining Yellen about the Zum Zum matter, or, given his duty to vigorously defend Lalota, might feel compelled to use against Yellen information that was revealed to him in confidence during the joint defense meetings. Simply stated, such set of circumstances would give rise to the "serious potential for conflict" about which the court in *Wheat* warned trial courts to be aware. 486 U.S. at 164.

21

Furthermore, even if the trial judge does not admit the evidence regarding the Zum Zum matter at Lalota's trial, there would still be a "serious potential for conflict" if Rosen were allowed to continue as counsel for Lalota. This is because, as previously stated, there is a distinct possibility (if not probability) that Rosen was privy to at least some incriminating information regarding Yellen's involvement in the Zum Zum case, but he would be prohibited from revealing such information by the joint defense doctrine. Yet, given Rosen's duty to vigorously defend Lalota at trial, and depending upon the nature of the incriminating information against Yellen, Rosen might feel compelled to use such information against Yellen when cross-examining him. More precisely, depending upon the nature of the incriminating information regarding Yellen's involvement in the Zum Zum matter to which Rosen was privy, Rosen might feel compelled to violate Yellen's confidences in furtherance of his duty to vigorously defend Lalota at trial. Again, this set of circumstances would give rise to the "serious potential for conflict" about which the court in *Wheat* warned trial courts to be aware. 486 U.S. at 164.

I will now turn to the events of late 2004 and the advent of the Allen-Edmonds investigation. While in my opinion the potential for a conflict of interest arising out of the Zum Zum matter is clear, the facts surrounding the events of late 2004 and the advent of the Allen-Edmonds investigation are not so clear. To be sure, both parties spend a good deal of time in their briefs discussing their respective views on whether Mr. Rosen was, in fact, Yellen's lawyer in December of 2004. Recall that, upon his being contacted by the FBI, Yellen told the agent to contact his attorney, Michael Rosen. Yellen maintains that he believed Rosen was his attorney, while Rosen maintains that he never had been Yellen's attorney, was not Yellen's attorney on the Zum Zum case, and certainly was not Yellen's attorney in December of 2004 on the Allen-Edmonds matter. Indeed,

22

Mr. Rosen testified that he knew nothing about the Allen-Edmonds matter at that time. This is why he was so intent on contacting AUSA O'Neil so that he could learn something about the case. It also explains why he claims he was unable to share with Ms. Yellen any information about the case other than the general differences between a New York State prosecution and a federal prosecution.

By contrast, Yellen testified that on or about December 22, 2004, Lalota and Yellen had a telephone conversation with Mr. Rosen during which conversation both Lalota and he "ma[d]e statements to Mr. Rosen regarding [the Allen-Edmonds] matter." (Tr. at 17.) Yellen further testified that a day or two thereafter (i.e., December 23 or 24, 2004), Lalota and Yellen met with Mr. Rosen, during which meeting both of them made "incriminating statements regarding [themselves]" and possible defenses to the Allen-Edmonds case were discussed. Mr. Frocarro subsequently arrived at this meeting and, according to Yellen, Mr. Rosen brought him "up to speed" on the situation. (Tr. at 20-21.)

To be sure, Rosen offered testimony regarding the claimed telephone call, and both Rosen and Frocarro offered testimony regarding the claimed meeting among Yellen, Lalota, Rosen, and Frocarro. Significantly, however, Mr. Rosen did not deny that Yellen and Lalota had called him on the phone on or about December 22, 2004. Rather, Mr. Rosen testified that he did not *recall* such a phone call. Moreover, neither Mr. Rosen nor Mr. Frocarro specifically *denied* that a meeting among Lalota, Yellen, Rosen, and Frocarro occurred prior to Christmas, 2004. Instead, both Rosen and Frocarro simply testified that they did not have a *specific recollection* of such a meeting.

Notably, the only other person who could have offered information either way regarding the claimed phone call and the claimed meeting about which Yellen offered definitive testimony was Lalota. And, although Lalota was present at the hearing on July 17, 2006, he was not called to testify

23

by Rosen. While I recognize that Attorney Rosen may have been hesitant to have Lalota testify given the government's opportunity to then cross-examine Lalota, it nevertheless seems to me that Lalota could have been called as a witness for the limited purpose of offering testimony on the following two issues: (1) whether the claimed phone call between Lalota, Yellen, and Rosen occurred on or about December 22, 2004; and (2) whether the claimed meeting which allegedly took place shortly thereafter actually occurred.

The bottom line is that, in the end, I am faced on the one hand with Yellen's definitive testimony that the phone call and meeting occurred, and on the other hand, with Rosen and Frocarro's testimony that they simply did not recall if the phone call or the meeting occurred. Given the paucity of evidence presented that the phone call and/or meeting did **not** occur, I find that there is a distinct possibility that there was at least some type of communication between Yellen and Rosen during the latter part of 2004 regarding the Allen-Edmonds matter. Indeed, given the fact that Lalota and Yellen had a close working relationship (and thus, when Lalota was contacted by the FBI he would relay that information to Yellen), and given the events which were occurring at that time, that is, Lalota's contact with the FBI regarding the Allen-Edmonds matter on December 21, 2004, and Yellen's contact with the FBI on December 22, 2004, *and* given the fact that throughout the pendency of the Zum Zum matter the vast majority of Yellen and Lalota's contacts with their attorneys occurred in the presence of Rosen, I find it reasonable that Yellen and Lalota would, in the face of their new legal troubles, turn to Rosen.

It may be that, at the point in time when Yellen told the FBI to call Mr. Rosen, Yellen had not talked to Mr. Rosen about formally retaining him. Indeed, Yellen may not even have considered doing so. But that is not the point. The point is that I am faced with the distinct possibility that

24

Yellen (along with Lalota) did communicate with Mr. Rosen at some point in time on the heels of Lalota's being contacted by the FBI on December 21, 2004. And, given the events surrounding this communication, and thus, the nature of this communication, there is a distinct possibility (if not probability) that Yellen shared with Rosen certain information which was, at least in his mind, and at least in some respects, self-incriminatory. Accordingly, under such circumstances it was not unreasonable for Yellen to believe that Mr. Rosen was his attorney, at least in the sense that Mr. Rosen would be under an obligation of confidentiality with respect to any and all information Yellen may have provided him regarding the Allen-Edmonds matter at that time. *See Evans*, 113 F.3d at 1465 ("'[A]n individual's mere subjective belief'" that he or she is represented is not enough. Rather, "'at least in the absence of any relatively clear indication by the potential client to the attorney that he believed he was being . . . represented, we think no . . . attorney-client relationship can be inferred without some finding that the potential client's subjective belief is *minimally reasonable*.'") (quoting *United States v. Keplinger*, 776 F.2d 678, 701 (7th Cir. 1985)) (emphasis added).

And so, given Mr. Rosen's potential for a conflict of interest arising from the information he was privy to with respect to the Zum Zum case, as well as the distinct possibility that Yellen revealed self-incriminatory information to Mr. Rosen during the early stages of the investigation of the Allen-Edmonds matter, I regrettably conclude that the government's motion should be granted with respect to Mr. Rosen. As discussed, Mr. Rosen's continued representation of Lalota presents a "serious potential for conflict" which arises out of his professional involvement both in the Zum Zum case and the distinct possibility that he received information from Yellen during the early stages of the Allen-Edmonds case. To reiterate, a criminal defendant's right to his chosen attorney is one that is

25

protected by the Sixth Amendment. Nevertheless, it is a right that "may be outweighed by a serious potential for conflict." *United States v. Algee*, 309 F.3d 1011, 1013 (7th Cir. 2002) (citing *Wheat*, 486 U.S. at 153).

For the reasons set forth above, there is indeed a serious potential for conflict if Mr. Rosen were allowed to represent Lalota at the trial of this matter. After all, a material part of the government's case against Lalota will be the testimony of Yellen. Thus, Yellen's credibility will be a center stage issue. Faced with the potential of violating confidences shared with him by Yellen, Rosen might be tempted to pull some punches in attacking Yellen's credibility. That would not be fair to Lalota. On the flip side of that same coin, Rosen might go full bore in attacking Yellen's credibility and, in so doing, use against Yellen (albeit, even if unintentionally) information obtained from Yellen in confidence. That would be unfair to Yellen. And, just as importantly, the occurrence of either scenario would be unfair to the integrity of the judicial process. Indeed, in *Wheat* the Court stated the unremarkable proposition that

> Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them. . . . Not only the interest of a criminal defendant but the institutional interest in the rendition of just verdicts in criminal cases may be jeopardized by unregulated multiple representation.

486 U.S. at 160.

That Mr. Rosen should be disqualified from representing Lalota at trial leads inexorably to the conclusion that Mr. Frocarro should be disqualified as well. It is undisputed that Mr. Frocarro represented Yellen in the Zum Zum matter. It is further undisputed that Yellen shared confidences with Mr. Frocarro that were undoubtedly incriminatory. Even Mr. Frocarro testified that such was the case.

26

Mr. Frocarro suggests that he should be allowed to stay on to assist Mr. Rosen in defending Lalota and that a "Chinese Wall" be set up to prevent him from sharing with Mr. Rosen confidences that Yellen had shared with him. I have no doubt that Mr. Frocarro would endeavor to maintain that "Chinese Wall." But, even if such a proposal were not already rendered moot by the disqualification of Mr. Rosen, I would nevertheless find such a proposal to be unacceptable. Simply stated, if Mr. Frocarro is representing Lalota, his obligations are to Lalota. I decline the invitation to put Mr. Frocarro in a position where he might feel the temptation to compromise his loyalty to either Mr. Yellen or to Mr. Lalota. Both Mr. Frocarro's integrity and the integrity of the federal criminal justice system are far too important to take that risk.[2] Thus, Mr. Frocarro will likewise be disqualified from representing Mr. Lalota at trial.

There is one final matter to discuss. In setting forth my conclusion that Mr. Rosen should be disqualified from representing Mr. Lalota at trial, I used the word "regrettably." There are a number of factors that, in my view, render my decision regrettable. First and foremost is the fact that Mr. Lalota will now have to find new counsel and his trial will be postponed for a significant period of time to allow new counsel an opportunity to familiarize himself with the case. Neither the government, nor Mr. Lalota, nor the public at large is well served by such delay. And, what makes this scenario especially regrettable is that we might not have had to delay the trial but for what, in my view, is the government's unreasonable delay in bringing the conflict of interest issue to the court's attention.

--------------------------------

[2] Indeed, the role that Mr. Rosen sought for Mr. Frocarro, despite the fact that he is an attorney, strikes this court as being akin to a paralegal. More precisely, Mr. Rosen testified that Mr. Frocarro was helping him organize the "hundreds of documents" that the government had sent to him. (Tr. at 100.) Given that Mr. Frocarro's assistance was to be merely administrative, he could in any event have been replaced with a paralegal.

27

As previously noted, on March 10, 2006, Lalota was arraigned on the superseding indictment. At that time, the trial was adjourned from March 27 to July 24, 2006. At that point in time, the government knew that on December 22, 2004, Yellen had told the FBI to contact his attorney, Michael Rosen, regarding the Allen- Edmonds matter. Indeed, the FBI's 302 form clearly states this. The government also knew at that point in time that on December 1, 2005, Yellen had entered into a plea agreement with the government under the terms of which he agreed to testify in this matter. Yet, it was not until July 12, 2006, that the government filed a motion seeking a hearing on the potential conflict of interest issue.

To be sure, it was apparently not until June 28, 2006, that government counsel interviewed Mr. Yellen "for the purpose of obtaining his statement." (Hoffman Aff. ¶ 2.) And, during the course of that statement Mr. Yellen "categorically stated that he was initially represented in this matter by Mr. Rosen who currently represents Mr. Lalota." (Hoffman Aff. ¶ 2.)

The fact remains, however, that as of December 1, 2005, when Yellen agreed to testify for the government, the government knew that Yellen had previously stated that Mr. Rosen represented him on the Allen-Edmonds matter. It was at that point that the government knew (or reasonably should have known) that a problem existed. The government should not have waited until the eve of Lalota's trial to bring that problem to the court's attention.

Nevertheless, regardless of the government's tardiness in bringing the conflict of interest issue to the attention of the court, the fact remains that, for the reasons set forth in this order, I am persuaded that the government's motion to disqualify both Mr. Rosen and Mr. Frocarro must be granted. Accordingly, the government's motion will be granted.

**NOW THEREFORE IT IS ORDERED** that the government's motion to disqualify Attorney Rosen and Attorney Frocarro from representing defendant Joseph Lalota at the trial in this criminal proceeding be and hereby is **GRANTED**;

**IT IS FURTHER ORDERED** that the defendant's motion for leave to file a sur-reply in opposition to the government's motion to disqualify be and hereby is **GRANTED**.

Your attention is directed to 28 U.S.C. § 636(b)(1)(A), Federal Rules of Criminal Procedure 59(a), and General Local Rule 72.3 (E.D. Wis.), whereby written objections to any order herein or part thereof may be filed within ten days of the date of service of this order. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Courtesy paper copies of any objections shall be sent directly to the chambers of the district judge assigned to the case. Failure to object in accordance tithe the rules cited herein waives your right to review.

**SO ORDERED** this <u>12th</u> day of September, 2006, at Milwaukee, Wisconsin.

/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge

Case 2:05-cr-00227-CNC   Filed 09/12/06   Page 29 of 29   Document 131